**E-FILED**
Monday, 17 October, 2016  03:16:06 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No: |
| | ) | |
| $5,830.00 IN U.S. CURRENCY, $7,000.00 IN | ) | |
| U.S. CURRENCY, JEWELRY VALUED AT | ) | |
| $950.00, JEWELRY VALUED AT $164,235.00 | ) | |
| FROM SAFE DEPOSIT BOX AT BANK OF | ) | |
| SPRINGFIELD, AND JEWELRY VALUED | ) | |
| AT $716.00 FROM CHASE BANK, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>VERIFIED COMPLAINT FOR FORFEITURE</u>**

NOW COMES the plaintiff, the United States of America, by and through its

attorneys, James A. Lewis, United States Attorney for the Central District of Illinois, and

Gregory M. Gilmore, Assistant United States Attorney, and respectfully states as follows:

1.      This is a civil action in rem brought to enforce the provisions of

18 U.S.C. § 981(a)(1)(C) for the forfeiture of $5,830.00 in U.S. Currency, $7,000.00 in U.S.

Currency, jewelry valued at $950.00, jewelry valued at $164,235.00 from safe deposit box at

Bank of Springfield, and jewelry valued at $716.00 from Chase Bank (defendant property),

as it is personal property which constitutes or is derived from proceeds traceable to an

offense constituting a specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7) (any

act or activity constituting an offense listed in 18 U.S.C. § 1961(1)), to include visa fraud

under 18 U.S.C. § 1546.

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

3.      This action is brought in the Central District of Illinois, Springfield Division, as the events which are the subject of this matter occurred in Springfield, Illinois, and will remain within the jurisdiction of this Court throughout the pendency of this action.

4.      The defendants are $5,830.00 in U.S. Currency, $7,000.00 in U.S. Currency, jewelry valued at $950.00, jewelry valued at $164,235.00 from safe deposit box at Bank of Springfield, and jewelry valued at $716.00 from Chase Bank

5.      Based on the detailed facts below, which support a reasonable belief that the government will be able to meet its burden of proof at trial, the government believes that defendant property constitutes or is derived from proceeds traceable to an offense constituting a specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7) (any act or activity constituting an offense listed in 18 U.S.C. § 1961(1)), to include visa fraud under 18 U.S.C. § 1546.

## BACKGROUND REGARDING SPECIALTY OCCUPATION H-1B WORK VISAS

6.      H-1B Work Visa

a.  Foreign nationals are not permitted to work in the United States for pay unless they obtain prior authorization from the United States Government.  Those foreign nationals wishing to work in the United States must apply for a work visa through a process involving the United States Department of Labor (DOL), Department of Homeland Security (DHS) and United States Department of State (DOS) which include in pertinent part, H-1B specialty occupation work visas.  H-1B visas are reserved for specialty occupation foreign

workers, such as computer programmers, scientists, and engineers who hold at least a bachelor's degree (or its equivalent).   H-1B visas were designed so industries could fill skill and labor gaps with foreign workers.   They have strict issuance requirements, lengthy processing times, fees, wage and labor promises, certifications, and quotas.

      b.   The number of available H-1B visas is currently capped at 65,000 per year.

      7.   <u>Labor Condition Application (LCA)</u>

      a.   If a U.S. company wishes to sponsor a foreign special occupation worker on an H-1B visa, the U.S. company, acting as a petitioner, begins the process by submitting a Labor Condition Application (LCA) for Nonimmigrant Workers (ETA Form 9035) to DOL. The purpose of the LCA is for the employer to disclose the prospective employee's job title, proposed wage, and place of employment, among other things.   The LCA also ensures that the petitioner has provided qualified American workers sufficient time and opportunity to apply for the proposed job by openly advertising the position. Once this obligation is met, the petitioner can then submit the LCA electronically through the cart Portal system and will receive a courtesy e-mail, confirming receipt of the LCA submission.   The electronic LCA submissions are received by the DOL iCERT system servers housed at the DOL National office located in the Frances Perkins building in Washington, D.C.

      b.   DOL then adjudicates the LCA and determines if the U.S. company qualifies to hire foreign workers.   If and when the application is approved, DOL electronically notifies the petitioner and DHS via e-mail. Once approved, all LCAs are required to be maintained on-site for inspection by immigration and law enforcement

officials.   Moreover, a copy of the LCA must be given to the H-1B worker no later than when he/she reports to work.

   c.  Based on training, experience, law enforcement personnel that petitioning companies typically save electronic copies of the LCA on their computers or other electronic storage devices and typically will e-mail copies of the LCA and supporting documentation to their employees, government officials upon request, and other companies with which they are engaged in business.

   d.  ETA 9035 form (LCA), section G, titled Employment and Prevailing Wage Information requires the employer to state the place or places they plan to employ the non-immigrant worker(s).   The employer is asked to provide the physical address of the place of employment.   A Post Office Box is not allowed.   The employer can use section G to identify up to three (3) physical locations if filed electronically.   If mailed the employer has to add an attachment for additional work sites.   If the physical location of employment changes during the duration of the beneficiary's H-1B visa status, a new LCA outlining the physical address of the new work location must be filed with DOL.

   e.  The employer also must list the prevailing wage information related to each physical location listed on the application.    The hiring of a foreign worker must not adversely affect the wages and working conditions of U.S. workers comparably employed. To comply with the statute, regulations require that the wages offered to a foreign worker must be the prevailing wage rate for the occupational classification in the area of

4

employment.   The prevailing wage rate is defined as the average wage paid to similarly employed workers in a specific occupation in the area of intended employment.

      f.      Section H, titled Employer Labor Condition Statements, informs potential employers that they must read section H of the Labor Condition Application and agree to four labor condition statements, as summarized below:

      (1)     **Wages:** Pay nonimmigrants at least the local prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time. Offer nonimmigrants benefits on the same basis as offered to U.S. workers.

      (2)     **Working Conditions:** Provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed.

      (3)     **Strike, Lockout, or Work Stoppage:** There is no strike, lockout, or work stoppage in the named occupation at the place of employment.

      (4)     **Notice:** Notice to union or to workers has been or will be provided in the named occupation at the place of employment.

      g.     A copy of this form will be provided to each nonimmigrant worker employed pursuant to the application. LCA Section K, Declaration of Employer states the following:

> "By signing this form, I, on behalf of the employer, attest that the information and labor condition statements provided are true and accurate; that I have read sections H and I of the Labor Condition Application – General Instructions Form ETA 9035CP, and that I

5

agree to comply with the Labor Condition Statements as set forth in the Labor Condition Application – General Instructions Form ETA 9035CP and with the Department of Labor regulations (20 CFR part 655, Subparts H and I). I agree to make this application, supporting documentation, and other records available to officials of the Department of Labor upon request during any investigation under the Immigration and Nationality Act. Making fraudulent representations on this Form can lead to civil or criminal action under 18 U.S.C. 1001, 18 U.S.C. 1546, or other provisions of law."

8.    The I-129 Petition

a.  After the LCA is approved and certified by DOL, the petitioner then prepares a Petition for a Nonimmigrant Worker (DHS Form I-129) for every foreign worker they wish to employ and submits the I-129 to a DHS processing center.  The I-129 is a 35-page document that is publicly available in a fillable portable document format (PDF) on the DHS U.S. Citizenship and Immigration Service (USCIS) website located at www.uscis.gov.   This PDF enables the petitioner to enter data directly onto the form and save it electronically on a computer or other electronic storage device for record keeping and printing for submission to DHS.   Among other things, the I-129 requires the name and biographical data of the proposed foreign worker, the proposed wage to be paid, and the address where the foreign worker will be working as well as biographical information about the petitioner.

b.  The I-129 requires the petitioner to "certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct.   If filing this on behalf of an organization, I certify that I am empowered to do so by that organization."   In the accompanying instructions for the I-129, the petitioner is advised that "[b]y signing this form, you have stated under penalty of perjury (28 U.S.C. § 1746) that all information and documentation submitted with this form is true and correct."   The instructions also add that "[i]f you knowingly and willfully falsify or conceal a material fact or submit a false document with this petition … you will face severe penalties provided by law and may be subject to criminal prosecution."   Thus, when a petitioner signs the Form I-129, it assumes the legal responsibility for the truth and accuracy of all information submitted.   If an I-129 is not signed, it will not be considered properly filed.

9.     Petitioners have the option to e-file the I-129 to DHS and will receive a receipt indicating the service center to which the I-129 was routed.   In the I-129, DHS reserves the right to verify any information submitted, including contact via written correspondence, telephone and "unannounced physical site inspections of residences and places of employment and interviews."   When the I-129 is submitted to DHS, DHS reviews all of the listed and supplemental documentation and adjudicates it.   If qualified, DHS approves the I-129.   If the H-1B beneficiary is already in the United States, DHS will mail the approval confirming H-1B status.

10.   <u>Visa Application: Form DS-160</u>

a.   If the H-1B visa beneficiary is not already in the United States, he/she must then apply for the H-1B visa by electronically submitting a DS-160 visa application to DOS. Prior to submitting the electronic application, the beneficiary is advised and agrees to the following: "By clicking 'Sign and Submit Application' you are electronically signing the application.   You are required to electronically sign your application yourself… Your electronic signature certifies that you have read and understood the questions in this application and that your answers are true and correct to the best of your knowledge and belief.   The submission of an application containing any false or misleading statements may result in the permanent refusal of a visa or the denial of entry into the United States.   All declarations made in this application are unsworn declarations made under penalty of perjury. (28 U.S.C. 1746)…"

b.   The H-1B beneficiary in most cases must appear for an interview before a DOS consular official at an overseas U.S. Consulate or Embassy.   Following consular approval by DOS, the H-1B visa is issued.

11.   <u>End Client Worksites</u>

a.   Some petitioners are in the business of obtaining H-1B visas for employees who will ultimately be placed with an end client that has the actual need for the employee. In pertinent part, should the petitioner, as an intermediary, wish to place its proposed foreign worker at an end client worksite, they can voluntarily submit their contracts, end client letters, or other documentation along with the I-129s to DHS.

8

b.   Although supporting documentation is not required in the H-1B process, its absence will usually trigger USCIS to issue a Request for Evidence (RFE), which can significantly delay the adjudication process.   RFEs occur when USCIS is unable to determine eligibility on the evidence provided. In order to avoid delays in processing, most petitioners will submit as much supporting documentation as possible along with the I-129 H-1B petition.

c.   Examples of supporting documentation from the petitioner include, in relevant part, (i) end client letters; (ii) vendor letters; (iii) purchase orders/contracts; and (iv) company support letters to USCIS.   These documents are summarized as follows:

    i.   <u>End client letters</u> are letters submitted by the ultimate client or a third-party worksite on behalf of the foreign worker and, in general, include the name of the foreign worker, his/her job title, the project(s) he/she is assigned to, the name of the foreign worker's onsite supervisor, and how long the foreign worker's services will be required.

    ii.   <u>Vendor letters</u> are letters submitted by companies that serve as middlemen between the petitioner and end client on behalf of the foreign worker.   Typically, Fortune 500 companies obtain foreign labor through vetted companies known as vendors.   In turn, vendors will subcontract their client's requirements to petitioning companies. In general, vendor letters include the name of the foreign worker,

his/her job title, the project(s) he/she is assigned, the name of the foreign worker's on-site supervisor, how long the foreign worker's services will be required and, in addition, describe the contractual relationship between the petitioner, vendor, and end client.

      iii.   <u>Purchase orders/contracts</u> between the petitioner, vendor (if any), and end client are used to clarify and establish the business/contractual relationship(s) between the parties.

      iv.  <u>Company support letters</u> are written by the petitioning company to USCIS on behalf of the foreign worker and identify the foreign worker by name, job duties, education and skills, and establish the contractual relationship(s) between the end client, vendor and any subcontractors.

    d. The validity date for an H-1B visa is generally determined by DHS based on the petitioner's alleged dates of employment for the foreign worker/beneficiary.   The maximum initial period for an H-1B visa is three years at issuance, but can be extended for an additional three years for a total of six years.   In the event that the beneficiary's employment concludes prior to the visa's expiration date, the visa can continue to be used by the beneficiary for subsequent employment, generally so long as notification of the change is made to DHS and DOL.

    e. Even if the petitioner acts on behalf of an end client, unless and until the beneficiary's visa has expired or has been transferred to a new petitioning company, the petitioner is the formal employer of the beneficiary.   While working at or for the end client,

the employee is paid by the petitioner, and it is standard industry practice that the petitioner is paid an ongoing fee by the end client that covers the cost of the wage or salary as well as a markup for profit for the petitioner.

## COMMON H-1B VISA FRAUD SCHEMES

12.     Based on training and experience, law enforcement is aware that H-1B visa fraud schemes generally have recognizable patterns and particular purposes, including, among others:

a.   Fabricated end clients. Investigations often reveal that the end client for which the beneficiary was petitioned to work does not actually exist, and was fabricated by the petitioner.   In some cases, the petitioners (and the preparers of the petitions) submit fraudulent materials in support of the petitions, including letters and contracts from the purported end client falsely claiming that the employer has a bona fide employment opportunity for the alien beneficiary.   Sometimes members of the fraudulent petitioner's family pose as company owners, directors, and managers on signed supporting documentation submitted to the government.   After the petition is approved, fraudulent petitioners profit from the scheme by having a "bench," a supply of qualified H-1B employees, with visas valid for the maximum term, ready to respond immediately to the market needs of actual end clients possessing actual employment offers, without the delays or limitations occasioned by the legal process for obtaining legitimate visas.

b.   Fees charged to beneficiaries.   Another way in which petitioners may profit from a visa fraud scheme is charging beneficiaries illicit fees.   The sole expense that the

beneficiary may pay is the DOS visa application fee of $190.00.   Any other costs connected

to the H-1B application and approval process must be paid by the petitioner/employer.   A

petitioner cannot force the H-1B beneficiary to pay the American Competitiveness and

Workforce Improvement Fee, the H&L Fraud Prevention and Detection Fee, attorney fees,

or any costs associated with the preparation and filing of the LCA and I-129 Petition to

include the I-129 premium processing fee (20 CFR 655.731(c)(9)).   Other illegal fees could

include a standard fee structure of thousands of dollars, charged by the petitioner/employer

to each beneficiary for the employer to petition the H-1B in the first place.   The

petitioner/employer could profit immensely by charging each of their beneficiaries the

above outlined illicit fees.

## FACTS ESTABLISHING PROBABLE CAUSE

13.     On January 5, 2013, HSI in Springfield, Illinois, received information regarding

a visa fraud conspiracy committed by Lead IT Corporation (hereinafter "Lead IT") and

specifically Ram Prasad Talluri ("R. TALLURI").   In total, HSI and Diplomatic Security

Service (DSS) received approximately seven fraud allegations pertaining to Lead IT and

opened an investigation into the alleged illicit activities of Lead IT.   All information

received appeared to contain specific, detailed, and intimate knowledge of Lead IT business

practices and employment-based visa petitioning operations.    In addition, DSS received an

anonymous letter from the Fraud Prevention Unit at Chennai, India, alleging H-1B fraud by

Lead IT and R. TALLURI.

14.     Relevant Companies

a.  Lead IT, Corporation—As of January 29, 2016, Lead IT was an active corporation registered in the state of Illinois. Lead IT specializes in providing information technology consulting services to various clienteles. The President of the corporation was listed as Rajani Talluri ("RJ. TALLURI") at 1999 Wabash Ave, Suites 210 & 213, Springfield, Illinois 62704. The Lead IT public website lists RJ.TALLURI as the CEO and R.TALLURI the Managing Director.

b.  SRT IT, Incorporated—Documentation from the Secretary of State in Illinois shows SRT IT, Inc. (hereinafter "SRT IT"), merged into surviving parent company Lead IT on November 3, 2015. During the time SRT IT, Inc. was active, the president of SRT IT, Inc. was listed as RJ. TALLURI, corporate address listed of 2416 Wimbledon Place, Springfield, Illinois 62704.

15.  All seven fraud allegations submitted to HSI and DSS stated that Lead IT knowingly engaged in a scheme by which the H-1B visa system was used to exploit the regulations of the worker visa program; employees were brought into the United States, in some cases not qualified to do specific job duties that were listed on documents provided to the U.S. Government, and for jobs that were fabricated with fraudulent information supporting the visa application process.   Illicit fees for the H-1B visa sponsorship were also charged to beneficiaries.   Lead IT used the employment-based nonimmigrant visa system and its employees to create an infrastructure to facilitate personal financial gain as well as reduce overhead and operating costs of the company.

16.  <u>Jaya Velagapudi ("Velagapudi")</u>

a.  On October 2, 2014 and October 23, 2014, Velagapudi was interviewed by investigators regarding information he previously provided to the HSI Tip Line. Velagapudi stated both Lead IT and SRT IT are owned and/or controlled by R.TALLURI. Velagapudi provided investigators with documentary evidence relating to his allegations against R. TALLURI.   Among the documents was a printout of an SMS text message conversation between Velagapudi and R. TALLURI.   This conversation detailed $4,500.00 worth of illicit fees charged by R.TALLURI for an H-1B visa for Velagapudi's wife, Hema Myneni ("Myneni").

b.  Velagapudi told investigators that R. TALLURI has used fraudulent client letters in support of the H-1B visa application process.   The positions purported to the U.S. Government in support of these H-1B visas did not actually exist.   After the visas were approved, R. TALLURI made the H-1B visa beneficiary find their own actual end-client subsequent to their arrival into the United States.   Velagapudi used his wife, Myneni's H-1B visa experience with SRT IT as an example to support this allegation.   The documentation supporting the issuance of Myneni's H-1B visa, which was submitted by SRT IT, purported, among her other credentials, that she worked at the Illinois Department of Commerce and Economic Opportunity.

c.  According to Velagapudi, his wife never worked at Illinois Department of Commerce and Economic Opportunity and after the H-1B visa status was approved, she had to find her own end-client, eventually finding placement at American Family Insurance in Madison, Wisconsin.   Velagapudi also stated that a new LCA was never filed by SRT IT

to reflect the different position and location in Wisconsin, as required by law.   Velagapudi added that R. TALLURI forced him to pay approximately $4,500.00 for Myneni's H-1B visa. Velagapudi stated he told R. TALLURI that he could not afford the $4,500.00 in one lump sum, so R. TALLURI advised Velagapudi that it would be deducted from his salary at the rate of $500.00 per pay check, or $1,000.00 per month.

      d.   Also during the interview, Velagapudi stated he was "benched" during some of the time he was an H-1B beneficiary employed by Lead IT, specifically from February 1, 2012 to February 15, 2012.   Velgapudi added during that period, his paycheck was still issued by Lead IT.   However, R. TALLURI forced Velgapudi to pay his salary back to Lead IT, less health insurance deductions, to make it look like Velagapudi was being paid during the benching period.

      e.   Velagapudi provided payroll records from Lead IT covering the period of February 1, 2012 to February 15, 2012.   The document shows Velagapudi was paid $2,400.00 for 80.00 hours of work and $135.50 deducted for health insurance.   Velagapudi told investigators shortly after receiving the payroll funds, he wrote a check to R. TALLURI for $2,265.00 to pay his salary back.

      f.   Furthermore, analysis of bank records obtained show that check number 227 from Velagapudi for $2,265.00, payable to R. TALLURI was deposited on April 26, 2012 into Bank of Springfield account number 3718166, an account owned and controlled by R. TALLURI and RJ. TALLURI.

      17.   <u>Hema Myneni</u>

a.  On January 2, 2015, Myneni presented herself for inspection as an H-1B nonimmigrant at Chicago O'Hare International Airport.   Myneni was sent to secondary inspection by Customs and Border Protection (CBP), where she was interviewed about the purpose of her trip and employment history in the United States.

b.  In a sworn statement, Myneni stated the owner of SRT IT was a man named Ram (R. TALLURI), who also owned Lead IT. Myneni added R. TALLURI advised Myneni that only having two years of work experience would not make her competitive for these types of jobs.   Myneni stated she was told she needed between six and eight years of work experience to be more appealing to potential clients and was given an exemplar resume showing eight years of experience with numerous information technology (IT) projects in the United States.   Myneni added that she used this fraudulent resume to obtain her position with end-client American Family Insurance under petitioner SRT IT (petition receipt file WAC1217352246 valid from October 29, 2012 to October 28, 2013). Myneni acknowledged she knew the use of false resumes was fraud.

c.  Myneni stated that she was charged $4,000.00 by SRT IT owner R. TALLURI for her H-1B visa. Myneni stated the $4,000.00 was deducted from her husband's (Velagapudi) paycheck by R. TALLURI.

d. On January 2, 2015, Myneni returned to India after withdrawing her application for admission to the United States in lieu of receiving a formal expedited removal.

18.   Srikanth Panaganti ("Panaganti")

a.   DHS Form I-129 assigned USCIS receipt number EAC1508051699 was approved on May 27, 2015, valid from May 27, 2015 to December 11, 2017.   The petitioner was Lead IT and the beneficiary was Panaganti, an Indian National.   The position was listed as quality analyst for end-client Erie Insurance located at 100 Erie Insurance Place, Erie, Pennsylvania and the petition was executed by Lead IT Director, R. TALLURI on January 26, 2015.   Since Panaganti was already present in the United States on a different H-1B visa at the time the I-129 petition was submitted/approved, USCIS sent the approval documentation to him as well as Lead IT.   The documentation confirmed H-1B status for Panaganti until December 11, 2017.

b.   On September 9, 2015, agents from USCIS – Fraud Detection and National Security Immigration (FDNSI) conducted a site visit as a part of the Administrative Site Visit and Verification Program (ASVVP).   The purpose and scope of the site visit was to confirm details provided in the DHS Form I-129 petition (above mentioned receipt number EAC1508051699) submitted to USCIS.

c.   During a site visit, the H-1B visa beneficiary Panaganti was not present at the end-client purported to the U.S. government, Erie Insurance.   According to FDNSI's contact with Erie Insurance Employment and Privacy Counsel Patrick Simpson, Panaganti had not worked at Erie Insurance since June 26, 2015 and would not be returning due to project termination from lack of funding.

d.   FDNSI agents spoke with R.TALLURI when he followed up with Lead IT.   R. TALLURI admitted that Panaganti was no longer working at Erie Insurance but that R.

TALLURI was currently in contact with Erie Insurance and Panaganti should be working there again in about two weeks.   This contradicted the aforementioned statements of Erie Insurance Employment and Privacy Counsel Patrick Simpson.   R. TALLURI also stated that Panaganti was on extended leave and would start work at Lead IT headquarters in Illinois on an in-house project.   Trained and experienced visa fraud investigators note that extended periods of leave shortly after beginning work for an H-1B petitioner is often used to conceal benching, a violation of H-1B federal regulations.   R. TALLURI provided documentation that Panaganti was on leave from June 29, 2015 to August 7, 2015.   R. TALLURI stated that Panaganti was doing in-house work at Lead IT headquarters that began August 10, 2015.

> e.   FDNSI agents reported that Lead IT had not complied with H-1B regulations and referred the results to the USCIS Service Center fraud unit in Vermont for further inquiry.

> f.   Despite the poor results of the site visit conducted by agents of FDNSI, the USCIS Vermont Service Center Fraud Unit found Lead IT to be compliant after additional follow-up with Lead IT, R. TALLURI, and immigration counsel Malik & Popiel, P.C. Investigators note that the compliance on the part of Lead IT appears to be reactionary to FDNSI's site visit conducted on September 9, 2015.   All e-mails, correspondence, and corroboration are dated after September 9, 2015. A new LCA was certified by DOL on September 17, 2015, more than one month after August 10, 2015, when Panaganti allegedly began work at the Lead IT headquarters in Springfield, Illinois.

18

g.   In a response to the ASVVP, R. TALLURI provided a letter dated October 13, 2015 to USCIS that purported Panaganti is residing at 2420 West Lawrence Ave, Springfield, Illinois.   The letter is signed by R. TALLURI, listed as the Director of Lead IT Corporation.

h.   Agents conducted surveillance at 2420 W. Lawrence Ave, Springfield, Illinois, on the following dates: January 5, 2016, January 6, 2016, January 8, 2016, January 12, 2016, January 15, 2016, and January 21, 2016.   Equipped with DHS and Department of State official travel photographs, Agents were able to compare faces of any individuals seen at surveillance locations.   At no point was Panaganti observed to be departing or arriving at 2420 W. Lawrence Ave, Springfield, Illinois.   This is contradictory to what was purported to the U.S. Government after the site visit as described above.

i.   Agents conducted surveillance at Lead IT (1999 Wabash Ave, Springfield, IL 62704), on the following dates: January 15, 2016, January 19, 2016, January 20, 2016, and January 21, 2016.   At no point was Panaganti observed to be inside, arriving, or departing Lead IT.   This is contradictory to the Lead IT in-house project purported to the U.S. Government after the site visit as described above.

19.   Jigneshkumar Kuberbhai Patel ("Patel")

a.   DHS Form I-129 assigned USCIS receipt number EAC1602051349 was approved on November 3, 2015, valid from November 3, 2015 to November 1, 2018.   The petitioner was Lead IT and the beneficiary Patel, an Indian National.   The position was listed as Software Developer for end-client Verizon located at One Verizon Place, in Alpharetta, Georgia.

b.   After the I-129 petition was approved, Patel completed an electronic DS-160 form to apply for the H-1B visa overseas.   Prior to electronically submitting the form, Patel was advised, in part, "By clicking "Sign and Submit Application" you are electronically signing the application.   You are required to electronically sign your application yourself … Your electronic signature certifies that you have read and understood the questions in this application and that your answers are true and correct to the best of your knowledge and belief.   The submission of an application containing any false or misleading statements may result in the permanent refusal of a visa or the denial of entry into the United States. All declarations made in this application are unsworn declarations made under penalty of perjury. (28 U.S.C. 1746)…" The visa was subsequently issued to Patel at Mumbai, India on December 22, 2015.

c.   On December 28, 2015, Patel traveled to the United States and agents covertly observed the CBP secondary inspection interview of Patel.   Patel was subsequently found inadmissible to the United States due to the sworn statement he gave to CBP.   Patel was found inadmissible because on October 22, 2015, Patel traveled and entered the United States on an H-1B visa after he was terminated by prior petitioner Blue Cross and Blue Shield Association.   During the sworn statement he gave to CBP, Patel stated that he left Blue Cross and Blue Shield Association in an attempt to find better opportunities for himself and his family.   Patel also admitted that after he was no longer employed by Blue Cross and Blue Shield Association, he used the Blue Cross and Blue Shield Association sponsored H-1B visa to re-enter the United States.   As a result of the secondary inspection interview,

Patel was found inadmissible, but was paroled into the United States by CBP in furtherance of multiple federal investigations. During the CBP secondary inspection interview, Patel stated that he owns a house at 1620 Persimmon Street, Hanover Park, Illinois.   This location is listed in multiple law enforcement databases as the residential address of Patel. Patel claimed that he commutes to his employment at H-1B end-client Verizon in Alpharetta, Georgia.

d. On Friday, February 5, 2016, agents conducted surveillance at 1620 Persimmon Street, Hanover Park, Illinois.   During this surveillance, Patel was seen shortly after 1015 hours when he exited the garage of 1620 Persimmon Street, proceeded to a large mailbox structure where he retrieved mail, and returned to the house via the garage.   Patel was not at his H-1B end-client Verizon in Alpharetta, Georgia as purported to the U.S. Government.

e.   On the evening of Wednesday, February 17, 2016, agents deployed a technical surveillance vehicle at 1620 Persimmon Street Hanover Park, Illinois. On Thursday, February 18, 2016, Patel was seen at the residence on multiple occasions.   On Friday, February 19, 2016 Patel was seen at the residence on multiple occasions.   Patel was not at his H-1B end-client Verizon in Alpharetta, Georgia as purported to the U.S. Government.

f.   On February 29, 2016, agents again deployed a technical surveillance vehicle at 1620 Persimmon Street, Hanover Park, IL.   On Monday, February 29, 2016, Patel was seen at the residence on multiple occasions.   On Tuesday, March 1, 2016, Patel was seen at

the residence on multiple occasions. Patel was not at his H-1B end-client Verizon in Alpharetta, Georgia as purported to the U.S. Government.

20.    <u>Seized Items</u>

a.    On May 10, 2016, law enforcement executed a search warrant on Bank of Springfield safe deposit box (#02-23129), belonging to R. TALLURI and RJ. TALLURI and seized $7,000 in U.S. Currency, and two gold bars, gold coins, gold jewelry such as chains, broaches, rings, bracelets, earrings, and watches, many of which were inlaid with gemstones, valued at $164,235.00. Following the seizure, R. TALLURI was interviewed by law enforcement and advised that he had a safe deposit box at Chase Bank, One East Old Capitol Plaza, Springfield, Illinois.

b.    On May 11, 2016, a search warrant was executed by agents on R. TALLURI'S Chase Bank safe deposit box (#5900) and seized $716.00 in jewelry.

c.    On May 21, 2016, law enforcement executed a search of R. TALLURI's residence and seized $5,830.00 in U.S. Currency and $950.00 in jewelry.

21.    The defendants are in custody of the United States.

22.    Based on the detailed facts above, which support a reasonable belief that the government will be able to meet its burden of proof at trial, the government believes that defendant property constitutes or is derived from proceeds traceable to an offense constituting a specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7) (any act or activity constituting an offense listed in 18 U.S.C. § 1961(1)), to include visa fraud under 18 U.S.C. § 1546.

WHEREFORE, the United States of America prays that this Court forfeit the

defendant property, to the United States of America for disposition according to law, for

the issuance of a Warrant in Rem, for costs of suit and for such other and further relief as

the Court may deem necessary.

Respectfully submitted,

JAMES A. LEWIS
UNITED STATES ATTORNEY

By:   /s/ Gregory M. Gilmore
      Assistant United States Attorney
      IL Reg. No. 6217499
      318 South 6th Street
      Springfield, Illinois 62701
      (217) 492-4450
      Fax: (217) 492-4044
      E-mail: greg.gilmore@usdoj.gov

VERIFICATION

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct based on information and belief.

Executed on this 17th day of October, 2016.

s/Daniel Bernthal

_____

Daniel Bernthal, Special Agent
U.S. Customs and Border Protection
Department of Homeland Security